## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JIM JONES, et al., | ) | CASE NO. 8:04CV645 |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| JOHN GALE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on the Defendants' Motion for Summary Judgment (Filing No. 68), and the Plaintiffs' Motion for Summary Judgment (Filing No. 82). For the reasons stated below, both motions will be granted in part and denied in part.

## PROCEDURAL BACKGROUND

Plaintiffs Jones, *et al.*, have challenged the constitutionality of Neb. Const. art. XII, § 8 ("Initiative 300"), alleging that its enforcement violates the Commerce Clause, the Privileges and Immunities Clause, and the Equal Protection Clause of the United States Constitution, as well as 42 U.S.C. § 1983, and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). (Complaint, ¶ 12, Filing No. 1, 4:04cv3194). They seek declaratory and injunctive relief against two Defendants: Nebraska Attorney General Jon Bruning in his official capacity, and Nebraska Secretary of State John Gale in his official capacity.

The Defendants have moved for summary judgment, alleging that the Plaintiffs do not have standing to argue that Initiative 300 violates the Commerce Clause; Initiative 300 does not violate the Commerce Clause; certain of the Plaintiffs do not have standing to bring a Privileges and Immunities claim; Initiative 300 does not violate the Equal Protection Clause; the Plaintiffs have failed to establish a claim under 42 U.S.C. § 1983; certain

Plaintiffs lack standing to bring a claim under the ADA; and one Plaintiff's claim under the ADA lacks merit. The Plaintiffs have moved for summary judgment, alleging that Initiative 300 does violate the Commerce Clause, the ADA, the Privileges and Immunities Clause, and, as a result, the Plaintiffs' rights under 42 U.S.C. § 1983.

## STANDARD OF REVIEW

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Philip v. Ford Motor Co.*, 328 F.3d 1020, 1023 (8th Cir. 2003). The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The proponent need not, however, negate the opponent's claims or defenses. *Id.* at 324-25.

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." *Id.* at 586.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  *Id.* at 249-50 (citations omitted).

Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp.*, 477 U.S. at 327.

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).

## CONSTITUTIONAL AND STATUTORY FRAMEWORK

Neb. Const. art. XII, § 8, popularly known as "Initiative 300," states, in part: "No corporation or syndicate shall acquire, or otherwise obtain an interest, whether legal, beneficial, or otherwise, in any title to real estate used for farming or ranching in this state, or engage in farming or ranching."  Initiative 300 defines "farming or ranching" as "(i) the cultivation of land for the production of agricultural crops, fruit, or other horticultural products, or (ii) the ownership, keeping or feeding of animals for the production of livestock or livestock products."  Initiative 300 provides a wide variety of exceptions to its general prohibition, including an exception for "family farm or ranch corporation[s]."  *Id.* at (1)(A). A "family farm or ranch corporation" is defined as:

> a corporation engaged in farming or ranching or the ownership of agricultural land, in which the majority of the voting stock is held by members of a family, or a trust created for the benefit of a member of that family, related to one another within the fourth degree of kindred according to the rules of civil law, or their spouses, at least one of whom is a person residing on or actively engaged in the day to day labor and management of the farm or ranch and none of whose stockholders are non-resident aliens and none of whose stockholders are corporations or partnerships, unless all of the stockholders or partners of such entities are persons related within the fourth degree of kindred to the majority of stockholders in the family farm corporation.

*Id.* Initiative 300 provides a similar family-limited-partnership exemption, requiring that at least one of the partners be "a person residing on or actively engaged in the day to day labor and management of the farm or ranch . . . ." The Nebraska Supreme Court has interpreted the term "actively" to mean "constantly engaged," and the language "engaged in the day to day labor and management" as requiring that "such person be involved on a daily or routine basis in *all* aspects of the farm or ranch activities, be it labor or management." *Hall v. Progress Pig, Inc.*, 610 N.W.2d 420, 428 (Neb. 2000), emphasis added. According to the Nebraska Supreme Court, "[l]abor would encompass the physical chores attendant to the farm," and should be understood as "associated with physical activity," and meaning "'work, esp. of a hard or fatiguing kind; toil.'" *Id.* "'In legal significance labor implies toil; exertion producing weariness; manual exertion of a toilsome nature.'" *Id.*, quoting *American Surety Co. of New York v. Stuart*, 151 S.W.2d 886, 887 (Tex. App. 1941).

The Plaintiffs allege that Initiative 300 violates the Commerce Clause of the United States Constitution, which provides that "Congress shall have Power . . . To regulate Commerce . . . among the several States . . . ." U.S. Const. art. I, § 8, cl.3. The dormant Commerce Clause is the negative implication of the Commerce Clause, pursuant to which

4

states may not enact laws that discriminate against or unduly burden interstate commerce. *Quill v. North Dakota*, 504 U.S. 298, 312 (1992).

Certain of the Plaintiffs also allege that Initiative 300 violates the Privileges and Immunities Clause, which provides: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States," (U.S. Const. art. IV, § 2), and the Equal Protection Clause, which provides: "No State shall . . . deny to any person within its jurisdiction equal protection of the law," (U.S. Const. amend. 14, § 1).

Initiative 300 requires the Nebraska Secretary of State to "monitor corporate and syndicate agricultural land purchases and corporate and syndicate farming and ranching operations, and notify the Attorney General of any possible violations."  If the Nebraska Attorney General has reason to believe that a corporation or syndicate is violating the terms of Initiative 300, the Attorney General is required to "commence an action in district court to enjoin any pending illegal land purchase, or livestock operation, or to force divestiture of land held in violation of [Initiative 300]."  Consequently, the Plaintiffs brought their action, seeking declaratory and injunctive relief, against Nebraska Secretary of State John Gale and Nebraska Attorney General Jon Bruning, in their official capacities; and certain of the Plaintiffs claim that Initiative 300's alleged constitutional infirmities also give rise to a cause of action against Gale and Bruning under 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

5

Finally, two Plaintiffs allege that Initiative 300's requirement that at least one family member holding stock in a family farm or ranch limited-liability entity be "a person residing on or actively engaged in the day to day labor and management of the farm or ranch," violates their rights under the ADA, which provides that "no qualified person with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. These Plaintiffs contend that Initiative 300 must yield to the ADA, based on the Supremacy Clause of the United States Constitution, U.S. Const. Art. VI, cl. 2, which provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

## FACTS

### *Objections to the Evidentiary Record*

Although all the Defendants and Plaintiffs have moved for summary judgment, alleging that there is no genuine issue of material fact, the parties have submitted extensive objections to each other's evidentiary records. (Defendants' Objections to Plaintiffs' Indexes of Evidence, Filings No. 80 and 89; and Plaintiffs' Objections to Defendants' Index of Evidence, Filing No. 101). In general, when an evidentiary record consists of thousands of pages of documents, giving rise to hundreds of objections, it may safely be assumed that there are genuine issues of material fact precluding summary judgment. In this case, however, the core issues are much more straightforward than the evidentiary record would indicate. As the Plaintiffs have noted, much of the documentary

6

evidence submitted by the Defendants purports to show that Initiative 300 does not have a discriminatory effect on interstate commerce – a fact-intensive issue not pursued by the Plaintiffs in their Motion for Summary Judgment.

The hundreds of objections raised to the parties' respective evidentiary records fall into five basic categories: relevance, foundation, hearsay, conclusions of law, and improper expert testimony.  I will not consider materials in the evidentiary record that are irrelevant to the issues presented in the parties' motions, nor will I consider materials that lack proper foundation, consist of inadmissible hearsay, present conclusions of law, or purport to offer expert testimony.  The evidentiary materials specifically cited within this Memorandum and Order are materials that I find unobjectionable for the purpose for which they are offered, and that support a finding of fact about which there is no genuine dispute.

### *Undisputed Material Facts*

The following facts, material to the resolution of the issues before the Court and affecting *all* Plaintiffs, are undisputed based on the statements of fact in the parties' briefs, and such facts are properly supported by the parties' indexes of evidence as referenced in the briefs.[1]  Undisputed material facts specific to particular Plaintiffs will be set forth in the analysis section, below.

Initiative 300 originated as a constitutional amendment proposed through the initiative petition process and appeared as a ballot question on Nebraska's 1982 general election ballot.  A ballot title and explanatory statement were prepared for Initiative 300 by

---

[1]The Defendants' statement of facts is not disputed, (Defendants' Brief, Filing No. 69, pp. 7-11; Plaintiffs' Brief, Filing No. 78, p. 8). The Defendants do dispute certain portions of the Plaintiffs' statement of facts with respect to the alleged impact of Initiative 300 on the Plaintiffs' finances or business operations, and with respect to the alternatives available to the Plaintiffs under Initiative 300 to achieve their business goals. (Plaintiffs' Brief, Filing No. 83, pp. 6-17; Defendants' Brief, Filing No. 91, pp. 3-5).

the Nebraska Attorney General for placement on the ballot by the Secretary of State.  As defined by law, the purpose of the ballot title was to express the purpose of the measure in up to one hundred words.  The ballot title submitted to Nebraska voters with regard to Initiative 300, stated, in part: "Shall a constitutional prohibition be created prohibiting ownership of Nebraska farm or ranch land by any corporation, domestic or foreign, which is not a Nebraska family farm corporation . . . ?"  The purpose of the statement was to explain the effect of a vote for or against the measure.  The explanatory statement presented to Nebraska voters for Initiative 300 stated: "A vote FOR will create a constitutional prohibition against further purchase of Nebraska farm and ranch lands by any corporation or syndicate other than a Nebraska family farm corporation.  A vote AGAINST will reject such a constitutional restriction on ownership of Nebraska farm and ranch land."  The Secretary of State caused the ballot title and text of Initiative 300 to be published in all legal newspapers in the state once each week for three consecutive weeks preceding the 1982 general election.  Nebraska's current requirement for publication of informational pamphlets regarding initiated amendments had not been enacted at the time Initiative 300 was proposed.  The Initiative process allowed a challenge by any person who was dissatisfied with the ballot title provided by the Attorney General.  No challenge to the Initiative 300 ballot title was filed in the district court asking for a different title.  Initiative 300 was adopted by Nebraska voters, and it became part of the Nebraska Constitution upon the issuance of a proclamation by the Governor on November 29, 1982.

## ANALYSIS

### *I.  Standing*

To establish standing, a plaintiff must have suffered an injury in fact that is (1)(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2)

traceable to the defendant's challenged action; and (3) likely to be redressed by a favorable decision. *South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 591 (8th Cir. 2003)(hereafter "*Hazeltine II*"), citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 561 (1992). If a plaintiff does not show an injury that is concrete, particularized, and actual or imminent, the plaintiff lacks standing to assert a claim, and a court is without subject matter jurisdiction over such an action. *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002).

### *Jim Jones*

Plaintiff Jim Jones resides near Eddyville, Nebraska, and has been actively engaged in farming and ranching for over 40 years. To get started in his farming and ranching business in 1963, Jones entered into a business arrangement with an unrelated older farmer/rancher. In 1977, prior to the adoption of Initiative 300, the older farmer/rancher's land was transferred to a new corporation in exchange for corporate stock and Jones was allowed to purchase up to 48 per cent of the stock in the corporation, as long as the older farmer/rancher was living. Jones and his family now own all of the corporation's stock. (Complaint, Filing No. 1, ¶¶ 4, 30; Defendants' Brief, Filing No. 69, p. 9; Plaintiffs' Brief, Filing No. 78, p. 5; Declaration of Jim Jones, Filing No. A79 ("Jones Decl.") ¶¶ 2, 3, 6).

In 1988, Jones's son Gordon wanted to begin a career in farming and ranching in Nebraska by entering into a similar arrangement with an older, established farmer, but was prevented from forming such a corporation due to Initiative 300. Because Gordon could not establish a corporation with the older farmer/rancher, Jones's corporation was prevented from doing business with or merging with the corporation that Gordon could not form. (Jones Decl. ¶ 7).

9

Jones served as a Nebraska state senator from 1993 to 2005, and introduced legislation to provide increased opportunities for young Nebraskans wishing to begin a career in farming and ranching.  The bills he proposed were met with "stiff resistance" and "killed in committee" by opponents who claimed that Jones's proposed legislation would violate Initiative 300.  (Jones Decl. ¶¶ 2, 4, 8).

Jones contends that he has suffered an injury that gives him standing to challenge Initiative 300 because (1) individually[2] and as a majority shareholder in his family corporation, he cannot contract with non-qualifying out-of-state corporations for the purpose of raising and feeding livestock for slaughter, causing him loss of income; (2) farm and ranch land that Jones owns personally and as a majority shareholder in his family farm corporation has diminished in value because potential purchasers of the land are non-qualifying corporations prohibited by Initiative 300 from owning the land; (3) he cannot sell his stock in the family farm corporation to a person or entity that does not qualify under Initiative 300, thus reducing the value of his corporate stock; and (4) Initiative 300 generally impedes his ability to contract, compete, borrow funds, convey assets, plan his estate, and assist younger farmers in establishing their careers.  (Jones Decl. ¶¶ 9-19).

The Defendants contend that Jones lacks standing to pursue his claims because Initiative 300 does not apply to individuals and because Jones's action is not a derivative action on behalf of any corporation.  It is true that third parties do not have standing to assert the rights of legal interests of others in order to obtain relief from injury to themselves.  *Hazeltine II*, 340 F.3d at 591, citing *Ben Oehrleins & Sons & Daughter, Inc.*

---

[2] Jones states that he owns Nebraska farm and ranch land personally as well as through the family farm corporation.  (Jones Decl. ¶ 11.)

*v. Hennepin County*, 115 F.3d 1372, 1379 (8th Cir. 1997). Therefore, to the extent that Jones purports to make any claim on behalf of his son, his family corporation, or the younger farmers he would like to assist, Jones lacks standing to pursue such claims. Similarly, Jones's status as a former state senator who was unsuccessful in promoting certain legislation provides him with no standing to challenge Initiative 300.

Jones has also alleged, however, that *he* has suffered certain injuries that are (1)(a) concrete and particularized and (b) actual or imminent; (2) traceable to the enforcement of Initiative 300; and (3) subject to redress by a favorable decision. While Initiative 300 does not prohibit Jones from engaging in farming and ranching, it does prevent him from entering into contracts that he otherwise would enter into with out-of-state corporations for such activities as the raising and feeding of livestock for slaughter, allegedly causing Jones personal financial loss. As an individual owner of farm and ranch land, Jones allegedly has suffered a loss of real estate and business value due to Initiative 300's exclusion of potential buyers from the market, reducing his borrowing power and prohibiting him from transferring ownership of his property as he wishes. Similarly, as a stockholder in a family farm corporation, Jones allegedly has suffered a loss of value in his stock due to Initiative 300's exclusion of potential buyers from the market, also reducing his borrowing power and prohibiting him from transferring ownership of his property – the stock – as he wishes.

The Eighth Circuit Court has made clear the fact that a plaintiff has standing to challenge the constitutionality of a law that has a negative effect on the plaintiff's borrowing power, financial strength, and fiscal planning (*Hazeltine II*, 340 F.3d at 592, citing *Clinton v. City of New York*, 524 U.S. 417, 431 (1998)), or when the law denies the plaintiff

11

business opportunities (*id.*, citing *Lepelletier v. FDIC*, 164 F.3d 37, 42 (D.C. Cir. 1999)). I conclude that Jones has standing to challenge the constitutionality of Initiative 300 under the Commerce Clause and the Equal Protection Clause based on his alleged, personal injuries-in-fact.

### *Terrence M. Schumacher*

Plaintiff Terrence M. Schumacher is a Colorado resident who owns an interest in Nebraska farmland in five counties.  (Declaration of Terrence M. Schumacher, Filing No. A79 in 04cv645, Ex. 4 ("Schumacher Decl.") ¶¶ 2, 4 ).  Neither he nor any of his relatives resides on the farmland, nor performs day-to-day labor on the land, nor manages it.  (*Id.* ¶ 4).  Schumacher wants to transfer his farmland to a limited liability entity to take advantage of favorable estate planning tools and to limit his exposure to personal liability, including tort liability.  He also wants to pool his Nebraska farm assets with those of his other relatives who own Nebraska farmland, to form a single, more efficient operating unit. (*Id.* ¶ 5).  Initiative 300 allegedly prevents him from transferring his farmland as he wishes, reduces his borrowing power, and impairs his ability to contract and compete in a national market.  (*Id.* ¶¶ 6-12).  He further alleges that Nebraska residents who qualify for the family farm exemption under Initiative 300 are not similarly burdened.  (*Id.* ¶¶ 10-12).  I conclude that Schumacher has standing to challenge the constitutionality of Initiative 300 under the Commerce Clause, the Equal Protection Clause, and the Privileges and Immunities Clause based on his alleged injuries-in-fact.

12

### Shad Dahlgren

Plaintiff Shad Dahlgren is a Nebraska resident (Complaint, ¶ 6) who owns a minority interest in a family farm corporation that operates a cattle feedlot in Nebraska. (Affidavit of Shad Dahlgren, Filing No. A79, Ex. 6 ("Dahlgren Aff.") ¶ 2). Dahlgren is also paraplegic and permanently confined to a wheelchair. (*Id.* ¶¶ 4-5). Dahlgren contends that, as a result of his disability, he cannot perform day-to-day labor and management needed to operate the family feedlot and consequently cannot become a majority owner of the family farm corporation unless related shareholders reside on the farm or are actively engaged in its day-to-day management. (*Id.* ¶¶ 7-9). Dahlgren has desired and currently desires to purchase a row-crop farm with other investors, holding ownership in a corporation to limit his liability. (*Id.* ¶¶ 12-15). Dahlgren contends that Initiative 300 precludes him from engaging in such economic activities because his physical disability prevents him from performing day-to-day labor on the farm, and his need for medical care prevents him from residing on the farm. (*Id.* ¶¶ 16, 18). I conclude that Dahlgren has standing to challenge Initiative 300 under the Commerce Clause, the Equal Protection Clause and the ADA.

### Harold G. Rickertsen

Plaintiff Harold G. Rickertsen is a Nebraska resident who retired from farming and ranching in 2000. (Declaration of Harold G. Rickertsen, Filing No. A79, Ex. 2 ("Rickertsen Decl.") ¶ 2). He still owns his farmland as a sole proprietor, renting it to others. (*Id.*). Rickertsen wants to make use of his management experience by forming a farm corporation and transferring a minority interest in his farm to a younger, unrelated farmer, while maintaining an active management role. (*Id.* ¶¶ 9-11). Rickertsen contends that

13

Initiative 300 has prevented him from entering into such a business relationship; reduced the number of eligible buyers for his land; limited his borrowing power; impaired his financial and estate-planning options; and restricted his access to national real estate, grain and livestock markets, because he is precluded from contracting with non-qualifying out-of-state corporate entities; all to his financial detriment. (*Id.* ¶¶ 12-15). I conclude that Rickertsen has standing to challenge the constitutionality of Initiative 300 under the Commerce Clause and the Equal Protection Clause, based on his alleged injuries-in-fact.

### ***Todd Ehler***

Todd Ehler is a resident of Nebraska who provided management services and periodic labor for his family's diversified farm until 2000. (Declaration of Todd Ehler, Filing No. A79, Ex. 5 ("Ehler Decl.") ¶¶ 2-3). Ehler suffers from neuropathy in his hands, feet, and legs, as well as significant muscle loss, weakness, and loss of balance. (*Id.* ¶¶ 5-6). As a result of his physical disabilities, Ehler is unable to perform the day-to-day physical labor necessary in typical farming, ranching or feedlot operations, and cannot provide the day-to-day labor needed to operate his family's farm. (*Id.* ¶ 8). Ehler's "intended arrangement" is to form a limited liability company with a neighboring farmer through which Ehler would provide management and marketing services for the farming operation as the majority owner, and the neighbor would provide the day-to-day care and feeding of livestock as well as the labor for production of grain. (*Id.* ¶ 9). Ehler alleges that, because of the restrictions in Initiative 300 combined with his physical disabilities that prevent him from performing day-to-day farm labor, he cannot form such a limited liability corporation with a non-relative; nor can he be the sole stockholder in a farm corporation. (*Id.* ¶¶ 10-

14

12).   As a result, Ehler contends that he suffers loss of economic opportunities and benefits that are available to non-disabled individuals.   (*Id.* ¶¶ 17-18).   I conclude that Ehler has standing to challenge the constitutionality of Initiative 300 under the Commerce Clause, the Equal Protection Clause, and the ADA.

### *Robert E. Beck, III*

Plaintiff Robert E. Beck, III, ("Beck") is a cattle rancher who resides in Buffalo County, Nebraska, where he also owns a commercial cattle feeding operation. (Declaration of Robert E. Beck, III ("Beck Decl."), Filing No. 79, Ex. 3, ¶ 2).   Many of his customers reside outside Nebraska.   (*Id.*).   Beck wants to contract with out-of-state corporate entities and limited liability partnerships that own cattle, but alleges that Initiative 300 prohibits him from doing so.   (*Id.* ¶ 3).   Some of Beck's existing customers have formed limited liability entities to own feeder cattle, but such entities allegedly cannot own the cattle fed in Nebraska, due to the restrictions of Initiative 300.   (*Id.*).   Consequently, Beck has lost business and income, has suffered reduced borrowing power, and has been restricted from access to national cattle markets.   (*Id.* ¶¶ 3-12).   I conclude that Beck has standing to challenge the constitutionality of Initiative 300 under the Commerce Clause and the Equal Protection Clause.

## II.  Commerce Clause

Under the Commerce Clause, Congress may regulate (1) the channels of interstate commerce, (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce, and (3) activities that substantially affect interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558-59 (1995).   "Farming or ranching" is defined in

Initiative 300 as "(i) the cultivation of land for the production of agricultural crops, fruit, or other horticultural products, or (ii) the ownership, keeping or feeding of animals for the production of livestock or livestock products." Producing, maintaining, and adding value to such farm commodities are activities that substantially affect interstate commerce. *Wickard v. Filburn*, 317 U.S. 111, 118-19 (1942)(Commerce Clause applied to production of wheat, even though production was only intended for consumption on the farm). Initiative 300 also affects other activities related to interstate commerce, by placing restrictions on the rental and sale of agricultural real estate. The rental of real estate is "unquestionably" an activity affecting interstate commerce. *Russell v. United States*, 471 U.S. 858, 862 (1985). A number of courts have also recognized that the sale of real estate is an activity affecting interstate commerce, and that state laws or regulations governing the sale of real estate are subject to dormant Commerce Clause analysis, even though real estate itself is incapable of physical movement in commerce. *See, e.g., Old Coach Development Corp., Inc. v. Tanzman,* 881 F.2d 1227, 1232 (3rd Cir. 1989); *Cranberry Hill Corp. v. Shaffer*, 629 F.Supp. 628, 630-36 (E.D.N.Y. 1986)("An item of commerce need not cross state lines to fall within the Commerce Clause's protection if its sale . . . will have an economic impact out-of-state." *Id., at* 631, citing *Wickard, supra.*

"A state law that is challenged on dormant Commerce Clause grounds is subject to a two-tiered analysis. First the court considers whether the challenged law discriminates against interstate commerce." *Hazeltine II*, 340 F.3d at 593. The Supreme Court has said, "in all but the narrowest circumstances, state laws violate the Commerce Clause if they mandate 'differential treatment of in-state and out-of-state economic interests that benefits

16

the former and burdens the latter.'" *Granholm v. Heald*, 125 S. Ct. 1885, 1895 (2005),

quoting *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.*, 511

U.S. 93, 99 (1994). "State laws that discriminate against interstate commerce face 'a

virtually *per se* rule of invalidity.'" *Id.* at 1897, quoting *Philadelphia v. New Jersey*, 437 U.S.

617, 624 (1978). "'When a state statute directly regulates or discriminates against

interstate commerce, or when its effect is to favor in-state economic interests over out-of-

state interests,'" the Supreme Court has "'generally struck down the statute without further

inquiry.'" *Id.* at 1904, quoting *Brown-Forman Distillers Corp. v. New York State Liquor

Authority*, 176 U.S. 573, 579 (1986). Only if a state can demonstrate that such a law

"advances a legitimate local purpose that cannot be adequately served by reasonable

nondiscriminatory alternatives," will it withstand scrutiny under the Commerce Clause. *Id.*

at 1905, citing *New Energy Co. of Ind. v. Limbach,* 486 U.S. 269, 278 (1988).

If a statute is not discriminatory, however, a second tier of analysis is warranted.

Such a statute will be struck down under the dormant Commerce Clause only if the burden

it imposes on interstate commerce is clearly excessive in relation to its putative local

benefits. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970). This *Pike* balancing test

need not be conducted if the statute is struck down under the first tier of analysis.

*Hazeltine II*, 340 F.3d at 597 n.9.

### A.  Does Initiative 300 Discriminate Against Interstate Commerce?

The Supreme Court has recognized three indicators of discrimination against out-of-

state interests. "First, discrimination can be discerned where the evidence in the record

demonstrates that the law has a discriminatory purpose." *Hazeltine II*, 340 F.3d at 593,

17

citing *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984).  Second, "a law could facially discriminate against out-of-state interests."  *Id.*, citing *Chem. Waste Mgmt. v. Hunt*, 504 U.S. 334, 342 (1992).  "Third, even if a state law responds to legitimate local concerns and is not discriminatory either in its purpose or on its face, the law could discriminate arbitrarily against interstate commerce, that is it could have a discriminatory effect."  *Id.*, citing *Maine v. Taylor,* 477 U.S. 131, 148 n.19 (1986).

The parties have stipulated that the issue of whether Initiative 300 has had a discriminatory *effect* on interstate commerce is fact-intensive and not appropriate for resolution on summary judgment.  See Report of Parties' Planning Conference (Filing No. 14) ¶¶ 3, 6, 12.  To the extent that evidentiary materials have been  submitted purporting to show how the adoption of Initiative 300 has in fact affected interstate commerce, I have not considered such materials.[3]  However, I also recognize that the three indicators of discrimination against interstate commerce are not necessarily discrete, but are often overlapping.  For example, if it is patently obvious from the *language* of a law that its *effect* will be to discriminate against out-of-state interests, then it may be inferred that those who drafted, promoted, and voted to adopt the law had a discriminatory *purpose*.

### *1.  Does Initiative 300 have a discriminatory purpose?*

With respect to the *purpose* underlying the adoption of Initiative 300, the Plaintiffs refer the Court to the ballot title and explanatory statement for Initiative 300, as well as

---

[3]  As discussed, *infra*, it is also unnecessary for me to consider such materials in connection with the "*Pike* balancing test," weighing whether the burden that Initiative 300 imposes on interstate commerce is clearly excessive in relation to its putative local benefits.  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

testimony regarding the historical background and sequence of events leading to its adoption.

The ballot title submitted to voters said: "Shall a constitutional prohibition be created prohibiting ownership of Nebraska farm or ranch land by any corporation, domestic or foreign, which is not a *Nebraska family farm* corporation . . . . ?" (Filing No. 70-1, Ex. 1C, emphasis added). The explanatory statement presented to Nebraska voters preceding the ballot title said: "A vote FOR will create a constitutional prohibition against further purchase of Nebraska farm and ranch lands by any corporation or syndicate other than a *Nebraska family farm* corporation.  A vote AGAINST will reject such a constitutional restriction on ownership of Nebraska farm and ranch land." (*Id.,* emphasis added).  There is also substantial evidence in the record that the purpose underlying Initiative 300, as expressed to voters through speeches, radio broadcasts, and news articles during the petition process and preceding the ballot vote, was to prevent the purchase of Nebraska farm and ranch land by "outside investors,"[4] and "rich out-of-state corporations."[5]

The Defendants argue that only the language of Initiative 300 itself, and its ballot title and explanatory statement, should be used to determine the purpose of the constitutional amendment.  They contend that, unlike the legislative history of a statute, the

---

[4] Deposition of Neil Oxton, Filing No. A79, Ex. 8, 40:4 -17, and Depo. Exhibit 12, appearing within Exhibit 11 to Filing A79.

[5] Filing A79B, Ex. 12.  (I note that Exhibit 12 at Filing A79A is the video of the I-300 Commercial - Center for Rural Affairs, while Exhibit 13 at Filing !79B is the video of the I-300 Celebration at Grand Island on December 5, 1991.  There are discrepancies in the numerical references to these exhibits in the briefs.)

historical background of a petition initiative for a constitutional amendment is irrelevant.[6]

The Eighth Circuit Court of Appeals, however, has said otherwise.  *Hazeltine II*, 340 F.3d

at 593-94.  Following the guidance of that Court, as I must do, the "Plaintiffs have the

burden of proving discriminatory purpose . . . and can look to several sources to meet that

burden," including "direct evidence that the drafters of [an initiative] or the [state] populace

that voted for [an initiative] intended to discriminate against out-of-state businesses."  *Id.*,

citing *SDDS, Inc. v. South Dakota*, 47 F.3d 263, 268 (8th Cir. 1995).  While I recognize that

the direct evidence of discriminatory purpose in this case may not be as strong as that in

*Hazeltine II*, there is substantial evidence to support the premise that Initiative 300 was

conceived and born in a  protectionist fervor.[7]  The ballot title and the language of Initiative

300 alone are persuasive evidence that Initiative 300 had a discriminatory purpose.  The

ballot title, and the language of Initiative 300 defining limited-liability-entity exemptions for

family farms and ranches, clearly indicate that people living and working in Nebraska, and

their families, will be given be favored treatment.  A discriminatory purpose on the part of

the drafters or voting populace, within the meaning of the dormant Commerce Clause, can

be inferred from that language.

---

[6]  I recognize that when addressing challenges to Initiative 300, the Nebraska Supreme Court has said: "There is no meaningful way to determine the intent which motivates voters to sign a petition for the submission of an enactment, nor is there any real way to determine the intent of those voters who vote for the adoption of an enactment."  *Omaha Nat'l Bank v. Spire*, 389 N.W.2d 269, 279 (Neb. 1986).  See also *Pig Pro Nonstock Cooperative v. Moore*, 568 N.W.2d 217, 223-24 (Neb. 1997).

[7]  The historical background of Initiative 300 discloses that its adoption was the culmination of efforts to restrict Nebraska land ownership by out-of-state corporations, including Prudential Insurance Company of New Jersey, and that the debate and publicity leading to Initiative 300 was replete with protectionist rhetoric. Filing No. A79, Ex. 8-13.

### 2. Does Initiative 300 facially discriminate against out-of-state interests?

When a similar state constitutional amendment was challenged in *South Dakota Farm Bureau, Inc. v. Hazeltine*, 202 F. Supp. 2d 1020 (D.S.D. 2002) (hereafter "*Hazeltine I*"), the district court chose not to "cross the 'first tier bridge'" and instead relied "on the so-called 'second tier' approach, the *Pike v. Bruce Church, Inc.* balancing test" in finding that South Dakota's constitutional amendment was in violation of the dormant Commerce Clause. *Id.* at 1049. The Eighth Circuit Court found that the amendment in question had an underlying discriminatory *purpose*, and, therefore, did not consider whether it was discriminatory on its *face*. *Hazeltine II,* 340 F.2d at 593.

In *Smithfield Foods, Inc. v. Miller*, 241 F. Supp. 2d 978 (S.D. Iowa 2003) (hereafter "*Smithfield I*"), the district court considered the constitutionality of a statute that prohibited certain pork processors from owning or controlling pork production in the state, while making exceptions for certain Iowa cooperative associations with members actively engaged in farming. The district court held that the statute, on its face, discriminated against interstate commerce because it provided different treatment for in-state interests and out-of-state interests, benefitting the former and burdening the latter. *Id.* at 990. The court noted that the statute was no less discriminatory simply because some in-state interests were burdened and some out-of-state interests were not. *Id.* at 990-91, citing *C&A Carbone, Inc. v. Clarkstown,* 511 U.S. 383, 391 (1994). The district court also concluded that the statute was enacted with a "discriminatory purpose to achieve a discriminatory effect." *Id.* at 992. Because the statute in question was amended pending

21

appeal, it is not known whether the Eighth Circuit Court would have agreed with the district court's analysis regarding facial discrimination. *Smithfield Foods, Inc. v. Miller*, 367 F.3d 1061, 1066 (8th Cir. 2004) (hereafter "*Smithfield II*"). I agree with the court's reasoning in *Smithfield I*, recognizing facial discrimination under the dormant Commerce Clause, and I find that reasoning equally applicable to Initiative 300.[8]

The Plaintiffs' affidavits illustrate,[9] and I take notice of the fact, that businesses operating as limited liability entities may have many advantages that individual business owners do not have. These advantages may include opportunities for raising capital, obtaining financing, transferring assets, and shareholder estate planning, in addition to limited shareholder liability. I also recognize that if limited liability companies are permitted to engage in agricultural endeavors without restriction, the competition they present for traditional farmers and ranchers may lead to profound changes in a state's rural economy and culture. If a state places restrictions on *who* can benefit from an advantageous business arrangement, however, I am obligated to inquire whether the restrictions unfairly favor in-state economic interests.

Initiative 300's general prohibition against farming or ranching by corporations and syndicates *does not* apply to family farm or ranch corporations or limited partnerships in which at least one family member "is a person residing on or actively engaged in the day

---

[8] There is a danger that facial discrimination, like beauty, may lie in the eye of the beholder. It is important, therefore, for a court to describe the factors that lead it to conclude that a law *on its face* discriminates against interstate commerce.

[9] Jones Decl. ¶¶ 9-19; Schumacher Decl. ¶¶ 5-12; Dahlgren Aff. ¶¶ 12-15; Rickertson Decl. ¶¶ 12-15; Ehler Decl. ¶¶ 17-18; Beck Decl. ¶¶ 3-12.

to day labor and management of the farm or ranch."[10]  Initiative 300 on its face, therefore, favors Nebraska residents, and people who are in such close proximity to Nebraska farms and ranches that a daily commute is physically and economically feasible for them. Corporations and limited partnerships that satisfy all the requirements of a family-farm corporation or family-farm limited partnership, but do not have a family member residing on the farm or engaged in on-site day-to-day physical labor and management, cannot own farm or ranch land; nor cultivate land; nor own, keep or feed livestock in Nebraska.

Some non-Nebraska residents living across the border from their Nebraska farmland may qualify for the family farm exceptions, while some Nebraska residents living at a great distance from their farmland may not.  That fact does not save Initiative 300 from facial discrimination.  The Supreme Court has found that legislation favoring in-state economic interests is facially invalid under the dormant Commerce Clause, even when such legislation also burdens some in-state interests or includes some out-of-state interests in the favored classification.[11]

---

[10]   A shareholder is not actively engaged in the day-to-day labor and management of the farm or ranch unless he or she is "involved on a daily or routine basis in all aspects of the farm or ranch activities, be it labor or management.  Labor would encompass the physical chores attendant to the farm, and management would encompass the mental and business activities of the operation."  *Hall v. Progress Pig, Inc.*, 610 N.W.2d 420, 428 (Neb. 2000).

[11]   In *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources,* 504 U.S. 353 (1992), the Court struck down a statute that allowed counties to ban out-of-county waste at their landfills.  In *Dean Milk Co. v. Madison*, 340 U.S. 349 (1951), the Court struck down an ordinance that made it unlawful to sell milk as "pasteurized" unless it had been processed at a plant within a radius of five miles from the central square of Madison.  In *Brimmer v. Rebman*, 138 U.S. 78 (1891), the Court struck down an inspection fee on meat from animals slaughtered more than 100 miles from the place of sale.  The fact that these laws burdened some in-state interests, or included some out-of-state interests in their favored classification, did not save the laws from being facially discriminatory under the dormant Commerce Clause.

Because most case law on the subject of the dormant Commerce Clause concerns movable products rather than land, Initiative 300's facial discrimination may be most readily apparent in its reference to "the ownership, keeping or feeding of animals for the production of livestock or livestock products." Initiative 300 discriminates against livestock based on origin, *i.e.*, those owned by corporations or limited partnerships that do not satisfy the Initiative 300 exemptions. Such discrimination based on origin causes a state to "isolate itself from the national economy," and constitutes facial discrimination under the dormant Commerce Clause. *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources,* 504 U.S. 353, 361 (1992).

Although the Defendants argue that Initiative 300's treatment of in-state economic interests and out-of-state economic interests should be considered under a "discriminatory effect" analysis, necessitating a fact-intensive review, I disagree. When it is apparent from the language of a statute, or a state constitutional amendment, that its effect is to burden out-of-state economic interests and benefit in-state economic interests, the party challenging it should not be required to bear the burden of an evidentiary hearing to prove the obvious.

### B.  Is Initiative 300 Nebraska's Exclusive Means of Advancing Legitimate Local Interests?

My findings that Initiative 300 had a discriminatory purpose and facially discriminates against interstate commerce, by treating out-of-state economic interests less favorably than in-state economic interests, does not end the Commerce Clause inquiry. Subjecting Initiative 300 to the "strictest scrutiny" I may uphold its constitutionality under the Commerce Clause if the Defendants can establish that they have "'no other means to

24

advance a legitimate local interest.'" *Smithfield II*, 367 F.3d at 1065, quoting *Oregon Waste*

*Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994); see also *Hazeltine II*, 340 F.3d

at 596-97, citing *C&A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 392

(1994).

In attempting to address the question of whether Initiative 300 advances a legitimate

local interest that can be advanced through no other means, the Defendants assert that:

> [T]he intent of Initiative 300 was to "retain and promote family farm
> operations in Nebraska and . . . to prevent a perceived threat that would
> stem from unrestricted corporate ownership of Nebraska farmland by
> preventing concentration of farmland in the hands of non-family
> corporations." *MSM Farms, Inc.* [v. Spire], 927 F.2d [330] at 333 [(8th Cir.
> 1991)]. Some of the perceived threats included absentee owners of land,
> negative effects on the social and economic culture of rural Nebraska, and
> a lack of good stewardship of the state's land, water, and natural resources.
> *Id.*
>
> If the perceived threat is the ownership of farmland by corporations,
> there appears to be no less restrictive way to cease the ownership of
> farmland by corporations than an out-right prohibition. In drafting Initiative
> 300, it appears the drafters did not believe family farm corporations, one of
> the family members of which lived or worked on the farm, posed the same
> threats as a traditional corporation and thereby exempted Family Farm
> Corporations from the prohibition.

Defendants' Brief, Filing No. 69, p. 30.

The Defendants also list seven "concerns" of Nebraska citizens regarding non-family

corporate ownership of farm and ranch land leading to the adoption of Initiative 300: (1)

economic competition, (2) reduced stewardship of natural resources, (3) reduced

participation in local government and volunteer activity, (4) vertical integration of

agricultural production, (5) efficiencies of scale reducing demand for labor, (6) reduced

demand for products and services from local businesses, and (7) reduced availability of

land for purchase upon death or retirement of the resident owner.  Defendants' Brief, Filing No. 91, p. 22.

Some of these local interests sought to be advanced by Initiative 300 are in fact protectionist interests, appearing to confirm that a discriminatory purpose motivated the adoption of the Initiative.  *Id*.  Recognizing that the conservation of natural resources and the promotion of rural economic development are legitimate local interests,[12] the next question is whether such interests can be advanced through no other means.  For example, if the drafters' concern was conservation of natural resources, one might question whether environmental regulations were considered as a less drastic and perhaps more effective alternative.  If the drafters' concern was the potential abuse of limited liability status, one might question whether mandatory liability insurance was considered as a less drastic and perhaps more effective alternative.  If the drafters' concern was the promotion of local economic development, one might question whether requiring family farm and ranch limited-liability entities to hire resident managers or to lease to qualified tenants was considered as a less drastic and perhaps more effective alternative.

As in *Hazeltine I* and *II*, there is no evidence that the drafters of Initiative 300 made any attempt to measure its probable effects or the probable effects of less drastic alternatives.  See *Hazeltine II*, 340 F.3d at 595.  The Defendants, therefore, have not met their burden of proving that Initiative 300 is the exclusive means of advancing legitimate local interests.

---

[12]  *MSM Farms, Inc. v. Spire,* 927 F.2d 330, 333 (8th Cir. 1991).

26

### III. Privileges and Immunities Clause

Under the Privileges and Immunities Clause, citizens have a right to be free from discrimination based on their state of citizenship or residence. That right, however, is not absolute. For example, the Privileges and Immunities Clause provides protection for non-residents in the areas of procuring medical services and engaging in commercial activity, but does not prevent a state from requiring non-residents to pay more for hunting licenses or tuition at state universities. *Saenz v. Roe*, 526 U.S. 489, 502 (1999). Similarly, the Privileges and Immunities Clause prevents states from imposing unreasonable burdens on citizens of other states in their pursuit of employment, their ownership and disposition of private property within the state, and their access to the courts, but *not* in areas of voting and qualification for public office. *Baldwin v. Fish and Game Comm'n of Montana*, 436 U.S. 371, 383 (1978).

Schumacher argues that "[b]ecause of his residency, he is precluded from performing the day to day labor and management of the farmland that he owns in Nebraska." (Plaintiffs' Brief, Filing No. 83, p. 55[13]). He also alleges that he cannot qualify for the exemptions from Initiative 300's restrictions "based on his residency and the residency of members of his family." (*Id.* at 59). He contends that Initiative 300's restrictions implicate fundamental rights, because they affect his ability to do business and pursue a common calling.[14] It is not his Colorado residency or citizenship that precludes him from performing day-to-day labor on his Nebraska farmland, however, but his physical

---

[13] Page references are to the CM/ECF document, not internal pagination.

[14] See *United Building and Construction Trades Council v. Camden*, 465 U.S. 208, 219 (1984).

27

location and the physical location of his family members.  As the Defendants note, the same restriction is imposed on Nebraska citizens or residents who do not live within commuting distance of their farmland.[15]

If a state law discriminates against an out-of-state citizen based on his or her citizenship or residency, then a court must inquire  (1) whether the law burdens a privilege and immunity protected by the clause, and if so, (2) whether there is substantial reason for discrimination against citizens of the other state.  *United Building and Construction Trades Council v. Camden*, 465 U.S. 208, 218 (1984).  Initiative 300 does not discriminate against Schumacher as an individual based on his citizenship or residency, although it does discriminate against *out-of-state economic interests.*  Because Schumacher has not suffered discrimination because of his citizenship or residency, past or present, his Privileges-and-Immunities claim must fail.

## IV.  *Equal Protection Clause*

The Defendants have moved for summary judgment on the Plaintiffs' Equal Protection Claim, citing *MSM Farms, Inc.*, 927 F.2d at 332, and arguing that it is settled law in the Eighth Circuit that Initiative 300 does not violate the Equal Protection Clause.  The Plaintiffs have not moved for summary judgment on their Equal Protection Claim, but assert that the classifications challenged in this action are different from the classifications

---

[15] I recognize that a law discriminating against in-state residents as well as out-of-state residents may violate the Privileges and Immunities Clause.  In *Camden*, 465 U.S. at 217-18, the Supreme Court found that a city ordinance giving employment preference to city residents violated the Privileges and Immunities Clause, even though it discriminated against certain in-state residents as well as all out-of-state residents.  It is doubtful that the Supreme Court would have reached the same result if the ordinance had simply required city employees or contract workers, whatever their residence or citizenship might be, *to appear for work* in the city of Camden.

challenged in *MSM Farms,* and that the Defendants' motion should be denied because genuine issues of material fact remain.

In *MSM Farms*, the Eighth Circuit Court noted that Initiative 300 involved no suspect classifications or fundamental rights, and therefore its varying treatment of different groups or persons did not violate the Equal Protection Clause unless such treatment was so unrelated to the achievement of any legitimate purposes that it must be viewed as irrational. *Id.* at 332. It is true that the Court in *MSM Farms* was considering Initiative 300's differing treatment of family farm corporations and non-family farm corporations. The Court said: "Whether *in fact* the law will meet its objectives is not the question: the equal protection clause is satisfied if the people of Nebraska could rationally have decided that prohibiting non-family farm corporations might protect an agriculture where families own and work the land." *Id.* at 333 (emphasis in original). Here, the Plaintiffs contend that the challenged classification concerns family farm corporations *with* resident farmers *vis a vis* family farm corporations *without* resident farmers.

Although the challenged classification in this case is somewhat different than that in *MSM Farms*, many of the factors that the Eighth Circuit accepted as forming a rational basis for Initiative 300's disparate treatment of family corporations and non-family corporations are equally applicable here. Favoring resident family farm corporations over non-resident family farm corporations may be said to "protect an agriculture where families own *and work* the land." *Id.* (emphasis added). Favoring resident family farm corporations may also prevent "absentee landowners and tenant operation of farms [that] would

29

adversely affect the rural social and economic structure, and would result in decreased stewardship and preservation of soil, water, and other natural resources." *Id.*

While I find that resident family farm corporations and non-resident family farm corporations are similarly situated for purposes of owning and operating farms and ranches in the state of Nebraska, I also find that there are rational bases for the disparate treatment of the two classes.[16]  Accordingly, I conclude that Initiative 300 does not violate the Equal Protection Clause and that the Defendants are entitled to summary judgment as a matter of law on the Plaintiffs' Equal Protection claim.

### V.  *42 U.S.C. § 1983*

Because I have found that the Defendants, acting under color of state law, have denied the Plaintiffs rights secured to them under the Commerce Clause of the United States Constitution, the Plaintiffs are entitled to judgment against the Defendants in their official capacities under 42 U.S.C. § 1983, including prospective injunctive relief, and may apply for attorneys' fees under 42 U.S.C. § 1988.

### VI.  *ADA*

Title II of the ADA provides, in part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  "Public entity" is defined to include "any State or local government; [and] any department, agency, special purpose district, or other

---

[16]  Neither in this Equal Protection analysis, nor in my analysis under any other provision of the United States Constitution or federal law, am I in any way passing judgment on the public-policy merits of Initiative 300.  I recognize that a myriad of public-policy arguments can be made in favor of and in opposition to Initiative 300.

instrumentality of a State or States or local government."  42 U.S.C. § 12131(1)(A)-(B).

"Qualified person with a disability" is defined as "an individual with a disability who, with or

without reasonable modifications to rules, policies, or practices, the removal of

architectural, communication, or transportation barriers, or the provision of auxiliary aids

and services, meets the essential eligibility requirements for the receipt of services or the

participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).

The ADA's reference to "programs, services, or activities" of a public entity has been

construed broadly, to apply to all activities of state and local governments, including the

adoption of standards for real estate zoning.  *Innovative Health Systems, Inc. v. City of*

*White Plains*, 117 F.3d 37, 44-45 (2nd Cir. 1997); *Bay Area Addiction Research and*

*Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 730 (9th Cir. 1999).

A plaintiff may bring a claim in federal court alleging violations of the ADA and

seeking prospective injunctive relief against state officials in their official capacities.  *See*

*Randolph v. Rodgers*, 253 F.3d 342, 347-48 (8th Cir. 2001); *Gibson v. Ark. Dep't of Corr.*,

265 F.3d 718, 722 (8th Cir. 2001); *Grey v. Wilburn*, 270 F.3d 607, 609 (8th Cir. 2001).

Plaintiffs Dahlgren and Ehler are disabled[17] and, because of their disabilities, cannot

perform daily physical labor on farms or feedlots.[18]  Dahlgren cannot live on a farm or at

---

[17]  An individual is considered disabled under the ADA if he or she (1) suffers from a physical or
mental impairment, that (2) affects a major life activity; and (3) the effect is substantial.  *Bragdon v. Abbott*,
524 U.S. 624, 631 (1998).  The impairment's impact must also be "permanent or long-term."  *Toyota Motor
Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002).  "Major life activities" include functions such as caring
for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.
28 C.F.R. § 41.31(b)(2); 45 C.F.R. § 84.3(j)(2)(ii); 24 C.F.R. § 100.201(b).

[18]  As discussed, *supra*, the Nebraska Supreme Court has interpreted the language of Initiative 300,
providing an exemption for family farm and ranch limited liability entities,  as requiring that "a person . . .
actively engaged in the day to day labor and management of the farm or ranch" be "involved on a daily or
routine basis in *all* aspects of the farm or ranch activities, be it labor or management."  *Hall v. Progress Pig,
Inc.*, 610 N.W.2d 420, 428 (Neb. 2000), emphasis added.  The Nebraska Supreme Court has interpreted the

a feedlot, due to his need for access to medical care.  Although Ehler does not allege that his disability prevents him from living on his family farm, he is employed at a different location in a business that accommodates his physical disabilities.  (Ehler Decl. ¶ 7). Ehler, therefore, faces the option of living idly on his farm where he cannot engage in productive labor, or maintaining gainful employment that accommodates his disability at a location removed from the farm.  Dahlgren and Ehler, therefore, cannot work on farms or at feedlots due to their physical disabilities, and they cannot live on their farms without sacrificing their health and/or their livelihoods.

The facially-neutral standards in Initiative 300 have a disparate impact on Dahlgren and Ehler, due to their disabilities.  Specifically,  Initiative 300 denies Dahlgren and Ehler the benefits of owning agricultural property in limited liability companies, as a result of their disabilities.  Non-disabled farm owners who can live on their farms or engage in daily physical labor on their farms are not so precluded. Dahlgren and Ehler are "qualified individual[s] with a disability," under the ADA, because each is qualified to own farmland in a limited liability company, *but for* Initiative 300's prohibition.  Each, by reason of his disability, has been excluded from participation in or otherwise denied the benefits of such an ownership arrangement, and thereby suffered discrimination through the application of Initiative 300.[19]

---

term "labor" as "associated with physical activity," and meaning "'work, esp. of a hard or fatiguing kind; toil." *Id.*  "'In legal significance labor implies toil; exertion producing weariness; manual exertion of a toilsome nature.'" *Id.*, quoting *American Surety Co. of New York v. Stuart,* 151 S.W.2d 886, 887 (Tex. App. 1941).

[19]  The U.S.District Court for the District of South Dakota reached the same conclusion with respect to ADA challenges to the nearly-identical South Dakota constitutional amendment. *South Dakota Farm Bureau, Inc. v. Hazeltine*, 202 F. Supp. 2d 1020, 1039-43 (2002), rev'd on procedural grounds, *South Dakota Farm Bureau, Inc. v. Hazeltine,* 340 F.3d 583, 589-91 (8th Cir. 2003).

If this were a case brought under the ADA to challenge a rule, policy or practice, one might inquire whether the Plaintiffs had requested "reasonable modifications" to accommodate their disabilities under 42 U.S.C. § 12131(2).  A reasonable accommodation of the Plaintiffs' disabilities might be to require that they lease their property to a qualified person, or employ such a person to reside on the property to perform day-to-day labor and management.  Because it is not a mere policy or practice that is challenged, however, but a provision in the Nebraska Constitution, it is fruitless for the Plaintiffs to request an accommodation that the Defendants cannot grant.

State laws and constitutional provisions are preempted by federal law when it is impossible to comply with both, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.  *South Dakota Min. Ass'n Inc. v. Lawrence County,* 155 F.3d 1005, 1009 (8th Cir. 1998), citing *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 581 (1987).  Because Initiative 300 conflicts with the ADA and stands as an obstacle to the accomplishment of Congress's purposes in enacting the ADA, Initiative 300 is invalid under the Supremacy Clause of the United States Constitution.  As prevailing parties under their ADA claim, Dahlgren and Ehler may apply for reasonable attorneys fees under 42 U.S.C. § 12205.

## VII.  *Severance*

Twenty-six words, stated twice within Initiative 300, gave rise to the Plaintiffs' challenge, and to this Court's conclusion that Initiative 300 does violate certain of the Plaintiffs' rights.  Those words, that help define the exemptions for family-farm limited partnerships and family-farm corporations, are: "*at least one of whom is a person residing*

33

*on or actively engaged in the day to day labor and management of the farm or ranch . . .*

*."* The final question this Court must address is whether those words or some other discrete portion of Initiative 300 can be severed to preserve the remainder.

The Nebraska Supreme Court has used a five-part test to determine whether an unconstitutional portion of a *statute* can be severed to preserve the valid portions. That court considers:

> (1) whether, absent the invalid portion, a workable plan remains; (2) whether the valid portions are independently enforceable; (3) whether the invalid portion was such an inducement to the valid parts that the valid parts would not have passed without the invalid part; (4) whether severance will do violence to the intent of the Legislature; and (5) whether a declaration of separability indicating that the Legislature would have enacted the bill absent the invalid portion is included in the act.

*Jaksha v. State*, 486 N.W.2d 858, 873 (Neb. 1992).

Where an initiative for an amendment to the state constitution is concerned, however, the Nebraska Supreme Court has said that the constitutional parts of the initiative "may be saved only if it appears that the unconstitutional part did not constitute an inducement to the passage of the remaining amendments." *Duggan v. Beermann*, 544 N.W.2d 68, 79-80 (Neb. 1996). "Where the expressed . . . intent is not severable, the inducement cannot be anything less than entire." *Id.*, citing *Fitzgerald v. Kuppinger*, 79 N.W.2d 547, 554 (1956).

Initiative 300 could well provide a workable plan, independently enforceable, if the 26 words at issue were stricken. Corporations and syndicates would be prohibited from engaging in farming or ranching in Nebraska, with exceptions made for family-farm corporations and limited partnerships. Initiative 300 has no severance clause, however,

34

and I cannot conclude that the residency or day-to-day-labor-and-management provisions in the family-farm exemptions were not an inducement to the passage of Initiative 300. To the contrary, based on the record before the Court, it appears that those provisions *were* an inducement to the passage of Initiative 300 and that it would do violence to the intent of the voters to sever those provisions. Because the unconstitutional portions are intertwined with the valid portions, Initiative 300 must be declared unconstitutional in its entirety.

## CONCLUSION

Initiative 300 does not violate the Equal Protection Clause or the Privileges and Immunities Clause, but does violate the dormant Commerce Clause and the ADA, causing the Plaintiffs to be prevailing parties under 42 U.S.C. § 1983. The foregoing order involves a controlling question of law as to which there is substantial ground for difference of opinion and an immediate appeal from the order may materially advance the ultimate termination of the litigation. Accordingly, the United States Court of Appeals for the Eighth Circuit may, in its discretion, permit an appeal to be taken from this order if application is made to it within ten days after the entry of the order. (28 U.S.C. § 1292(b)).

IT IS ORDERED:

1.      The Defendants' Objection to Index (Filing No. 80) is denied;

2.      The Defendants' Objection to Index (Filing No. 89) is denied;

3.      The Plaintiffs' Objection to Index (Filing No. 101) is denied;

4.      The Defendants' Motion for Summary Judgment (Filing No. 68, Case No. 8:04cv645) is granted with respect to Count II of the Complaint, alleging a

violation of the Privileges and Immunities Clause; Count III of the Complaint, alleging a violation of the Equal Protection Clause; and denied in all other respects;

5.    The Plaintiffs' Motion for Summary Judgment (Filing No. 82, Case No. 8:04cv645) is granted with respect to Count I of the Complaint, alleging a violation of the Commerce Clause; Count IV, alleging a deprivation of constitutional rights under 42 U.S.C. § 1983; and Count V, alleging a violation of Americans with Disabilities Act; and denied in all other respects;

6.    Any party may apply to the United States Court of Appeals for the Eighth Circuit for permission to pursue an interlocutory appeal within ten days of the date of this order;

7.    Absent a timely application for interlocutory appeal, a separate Declaratory Judgment will be entered in favor of the Plaintiffs on Counts I, IV and V; a permanent injunction will issue, enjoining the Defendants from enforcing Initiative 300; and a schedule will be established for the Plaintiffs' application for attorneys' fees as permitted by 42 U.S.C. §§ 1983, 1988 and 12205.

Dated this 15th day of December, 2005.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge

36